***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments of the parties. The appealing party has not shown good ground to reconsider the evidence; receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission AFFIRMS the Opinion and Award of Deputy Commissioner Holmes with minor modifications.
 *********** ISSUES TO BE DETERMINED
The following issues are to be determined by the Full Commission: *Page 2 
1. Whether plaintiff suffered a compensable injury by accident or specific traumatic incident to her low back on October 19, 2007 while employed by Moses Cone Health System?
2. Is plaintiff disabled as the result of the compensable injury to her neck and left shoulder on October 19, 2007, or is any alleged disability the result of her low back condition?
3. What benefits, if any, is plaintiff entitled to receive as a result of her alleged injury on October 19, 2007?
4. Has defendant failed to provide work suitable to plaintiff's post-injury capacity?
5. Plaintiff has submitted an additional issue, should defendant be required to pay late penalties, sanctions and attorney's fees for unjustifiably denying and/or not paying plaintiff's medical treatment and wage loss benefits on a timely basis?
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. The parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On October 19, 2007 the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
4. On October 19, 2007 an employment relationship existed between the employee and the defendant-employer. *Page 3 
5. The defendant-employer is a duly qualified self-insurer with CorVel Corporation as its servicing agent.
6. The plaintiff-employee contends that on or about October 19, 2007 she suffered an injury to her back and neck when she lifted a mattress to clean under a bed.
7. Pursuant to a Form 60 dated January 11, 2008, defendant accepted liability for the neck and left shoulder, but defendant denied liability for the lower back pursuant to a Form 61 dated April 3, 2008.
8. Defendant paid temporary total disability at the rate of $270.99 per week from October 22, 2007 to November 2, 2007, from November 22, 2007 to November 25, 2007 and from November 29, 2007 to January 8, 2008.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on May 2, 1960 and graduated from high school. Her prior work experience includes working for thirteen years at a diaper service and working as a housekeeper at motels. In July 2000 she began working in Environmental Services Department for defendant Moses Cone Health System. Plaintiff's duties included cleaning approximately thirty patient rooms on the Orthopedic Unit.
2. On October 19, 2007, plaintiff had between ten and thirteen discharge rooms to clean and get ready, which involved lifting up a portion of each patient bed to clean up underneath it. At approximately 3:00 p.m., she was in her last discharge room, cleaning under *Page 4 
he bed and then letting it back down, when she felt pain and burning in her neck and shoulders, worse on the left.
3. Shortly after this incident, plaintiff reported her injury to her supervisors, Vickie Mackey and Donna Donnell. Plaintiff told Mackey and Donnell that she had injured her neck and left shoulder, and based on this information Donnell completed a computerized incident report. Based on the information plaintiff gave her, Donnell documented plaintiff's injury as follows: "She was lifting the bed up to clean and went to put the bed down. She had a sharp pain, feels like it burns. It was her shoulder and neck area." Plaintiff said nothing to Donnell or Mackey about sustaining an injury to her lower back. Mackey directed plaintiff to Moses Cone Occupational Health for treatment.
4. On October 19, 2007, plaintiff was evaluated by Dr. Frieda Menzer, a board certified internal medicine physician at Moses Cone Occupational Health, for complaints of neck, upper back, and shoulder pain after changing bed linens at work. Plaintiff made no complaints about her lower back, lumbar spine, or lower extremities. The only significant finding on plaintiff's physical exam was some tenderness to palpation of the neck and upper back along the trapezius. Dr. Menzer diagnosed cervical strain and prescribed medications and modified duty work.
5. On October 26, 2007, plaintiff was evaluated again at Moses Cone Occupational Health, by Dr. Mary Ruth Hunt, who is board certified in both internal medicine and occupational medicine. On that date plaintiff complained of pain in her neck, upper back or trapezius area, and left upper arm. Plaintiff made no complaints to Dr. Hunt about pain in her lower back, lumbar spine, or lower extremities. Dr. Hunt's impression was cervical strain, and she recommended medication, physical therapy, and modified duty work. *Page 5 
6. Plaintiff had continued follow-up visits with either Dr. Menzer or Dr. Hunt at Moses Cone Occupational Health on November 2, 2007, November 9, 2007, November 16, 2007, November 30, 2007 and December 18, 2007. Plaintiff did not complain to either physician about pain in her lower back or lower extremities at any of these visits. Plaintiff's diagnosis of cervical strain remained the same throughout her two month period of treatment by Drs. Menzer and Hunt.
7. On December 18, 2007, Dr. Hunt recommended orthopedic referral and an MRI of the cervical spine.
8. Following her injury on October 19, 2007, plaintiff returned to work briefly in the Environmental Services Department, performing only the daily cleaning duties that were within her restrictions. Another employee was assigned to work with her and perform all of the discharge room cleaning. Plaintiff did not clean any discharge rooms. When the department could no longer accommodate her restrictions, plaintiff went out of work and defendant initiated payment of compensation for temporary total disability. During the period of time plaintiff was out of work, she continued to perform her normal activities of daily living, such as washing dishes, cleaning up the table, and doing grocery shopping.
9. Plaintiff testified that her lower back was also hurting when she returned to work the Monday following her injury. Plaintiff's testimony, however, is inconsistent with the history given by her to several medical providers.
10. On November 19, 2007, plaintiff was evaluated by Dr. Michael Hilts, a family practice and sports medicine physician at Piedmont Orthopedics. Plaintiff's complaints to Dr. Hilts centered on her neck, left shoulder, and the trapezius — the muscle in the upper back area between the neck and the shoulder. She made no complaints about her lower back, lumbar spine, *Page 6 
or lower extremities. Dr. Hilts testified that if plaintiff had complained about pain in her lower back, he would have documented those complaints in his office note.
11. On physical examination by Dr. Hilts, plaintiff's range of motion of her neck and left shoulder were normal. Upper extremity strength and reflexes were also normal, and nerve impingement and compression signs were negative. Plaintiff's neurologic exam was completely nonfocal. The only positive finding on physical examination was tenderness to palpation. X-rays of plaintiff's cervical spine showed spondylosis, or generalized arthritis, with the C5-6 level being affected the most. Dr. Hilt's diagnosis was: a) neck and left arm pain; b) suspect muscular strain with myofascial pain syndrome, and c) cannot rule out cervical spine disk herniation. Dr. Hilts did not make any diagnosis with respect to plaintiff's lower back or lumbar spine because "that was not one of her complaints at that visit." Because plaintiff had been placed on light duty restrictions by Moses Cone Occupational Health, Dr. Hilts also did not address plaintiff's work restrictions. He did note that plaintiff told him she had been tolerating light duty work. Dr. Hilts prescribed Valium for muscle spasms.
12. Plaintiff returned to Dr. Hilts on December 27, 2007, complaining of burning pain from the trapezius area down into the arm, and sometimes numbness in her hand. Plaintiff made no complaints about her lower back, lumbar spine, or lower extremities. Her examination was still nonfocal, with no evidence of deficit or nerve root compression. Dr. Hilts recommended an MRI scan of the cervical spine to rule out a disc herniation. Dr. Hilts made no diagnosis with respect to plaintiff's lumbar spine, and did not order an MRI of the lumbar spine, because plaintiff had made no complaints about her lumbar spine.
13. On or about January 9, 2008 plaintiff returned to work in a sedentary position, recording telephone messages on an answering system in the service response center. Plaintiff *Page 7 
performed that job from January until sometime in February or March 2008. She was able to get up and move around when she needed to, and she did not have any problems doing this sedentary job other than some stiffness in her neck.
14. On January 30, 2008, plaintiff returned to Dr. Hilts, reporting no change in her neck and left shoulder pain. She did complain of some low back pain since resuming work in early January. Dr. Hilts reviewed plaintiff's MRI of the cervical spine, which revealed multilevel osseous and degenerative disc changes but no evidence of nerve compression. The absence of nerve compression would indicate that plaintiff is not a good candidate for surgery. It was Dr. Hilts' impression on January 30, 2008 that at least some component of plaintiff's symptoms was myofascial in origin.
15. On February 14, 2008, Dr. Hilts recommended that plaintiff perform light duty work for six weeks, with no lifting over ten pounds and avoidance of bending and stooping. On February 15, 2008, however, plaintiff called Dr. Hilts' office complaining of severe back pain. Dr. Hilts took her out of work for two weeks and referred her to Dr. Mark Phillips for possible epidural injections.
16. On February 20, 2008 plaintiff was evaluated by Suzann Hedgecock, a physician's assistant to Dr. Mark Phillips at Guilford Pain Management, for complaints of neck and shoulder pain. Plaintiff also reported that she had developed low back pain upon returning to work. She denied any specific injury to her back. The previous Monday plaintiff had developed a new symptom in her right leg while walking in Wal-Mart. Plaintiff's physical exam was essentially normal with the exception of some tenderness to palpation, and there was no evidence of neurologic compromise or nerve compression. Ms. Hedgecock's assessment was cervical facet arthropathy, cervical radiculopathy, cervicalgia, and lumbago, or low back pain. *Page 8 
Ms. Hedgecock prescribed Lidoderm patches and Robaxin and also recommended moist heat and gentle stretches. She did not authorize plaintiff to be out of work or assign any work restrictions.
17. On March 12, 2008, plaintiff called Dr. Hilts again, reporting she felt ready to return to light duty work. Dr. Hilts released her to return to work effective March 17, 2008 with no lifting over 10 pounds and avoidance of bending and stooping for eight weeks.
18. Plaintiff then returned briefly to her environmental services position, but with the assistance of another employee to perform the heavier tasks and working on a smaller unit. Plaintiff then performed sedentary clerical work, assembling papers and notebooks or binders in the staff lounge, and then was moved to the Medical Records Department. In that position she worked at a table, going through patient charts to make sure each document in the chart pertained to the correct patient. This position required no lifting greater than ten pounds and no bending or stooping. Plaintiff described this job as "easy," and when asked whether she had any physical problems performing this job, she testified that her only complaint was that there was cold air blowing on her at her work station and that the cold bothered her neck and shoulder. When the department director asked plaintiff how she was doing, plaintiff commented that her back was hurting, but when the director offered to discuss ergonomic changes to her work station, plaintiff told the director not to worry about it because she had an appointment with her physician and he was going to take her out of work. Plaintiff continued to perform this sedentary position in the medical records department until she was taken out of work by Dr. Hilts on or about April 25, 2008.
19. In approximately February or March 2008, plaintiff asked her supervisor, Mackey, and Mr. Sandy Threatt, defendant's workers' compensation specialist, if they would *Page 9 
change or alter her original incident report from October 2007 to reflect that she had also injured her lower back on that date, so that she could receive treatment for her lower back under workers' compensation. Plaintiff did not have group health insurance or any personal health insurance. Mackay and Threatt declined to change the original incident report. In the conversation plaintiff had with Threatt about her condition during the spring of 2008, she was complaining more about her lower back than her neck. Plaintiff told Threatt that her lower back was bothering her so much she could not work and she needed some help.
20. Plaintiff returned to Dr. Hilts on March 20, 2008, again reporting that her low back pain had not developed until "since this all started, without a specific injury that she can think of. . . ." Neurologic exam of plaintiff's upper and lower extremities was nonfocal, and there was no evidence of nerve compression. Plaintiff did have myofascial trigger points in the trapezius and rhomboid areas and paraspinal muscle tenderness in the lumbosacral spine. Plaintiff never complained to Dr. Hilts of sciatica or other symptoms that might be related to nerve root compression from a lumbar disc. Dr. Hilts noted that the etiology of plaintiff's low back pain was uncertain, and he ordered a CT myelogram of the cervical and lumbar spine.
21. CT myelogram of the lumbar spine on April 11, 2008 showed severe multifactorial central stenosis at L4-L5 with severe lateral recess stenosis, right greater than left, as well as moderate central stenosis at L3-L4 and moderate stenosis at L5-S1 with disc bulging and ligamentum flavum hypertrophy at that level. CT myelogram of the cervical spine showed diffuse degenerative change, foraminal stenosis most severe on the right at C3-L4, shallow disc protrusions at C4-C5 and C5-C6 and a left paracentral protrusion at C6-C7.
22. Plaintiff also returned to Suzann Hedgecock on March 20, 2008, complaining of both neck and lower back pain. She was doing light duty work, and she had been to Moses Cone *Page 10 
Outpatient Clinic for evaluation of her low back pain. Hedgecock recommended physical therapy.
23. Plaintiff returned to Hedgecock on April 21, 2008, at which time physical examination was essentially unchanged. Plaintiff was complaining of increased pain in her back without any new injury. Hedgecock increased plaintiff's Lyrica and made arrangements for Dr. Phillips to review her myelogram so that he could determine whether an epidural steroid injection was appropriate.
24. Plaintiff returned to Dr. Hilts on April 24, 2008, continuing to report neck and low back pain. She said she had seen Dr. Phillips and was doing light duty work. Dr. Hilts' impression was neck and upper back pain secondary to injury at work with underlying severe C3-C4 foraminal stenosis, and lumbar spondylosis/foraminal stenosis. Dr. Hilts changed plaintiff's medications and suggested he would call Dr. Phillips regarding possible epidural injections. If she failed to improve with that, then he would consider a surgical consult with Dr. Mark Yates. Dr. Hilts also recommended continuing light duty work. The next day, April 25, 2008, however, plaintiff called Dr. Hilts' office and requested that he keep her out of work until she had her epidural steroid injection. Therefore, on April 25, 2008 Dr. Hilts gave plaintiff a note to be out of work for three more weeks. Plaintiff has not worked since approximately April 25, 2008.
25. Dr. Hilts has not seen plaintiff since April 24, 2008. On May 15, 2008, however, plaintiff called his office to say that she had an epidural injection scheduled for May 20, 2008 and requested an out of work note with a return to work date of May 26, 2008. Dr. Hilts agreed to her request and gave her a note excusing her from work until May 26, 2008. Dr. Hilts has not issued any work notes or restrictions for plaintiff since that time. According to Dr. Hilts, and *Page 11 
based on plaintiff's neurological exam on April 24, 2008, plaintiff was physically capable of doing sedentary, clerical type work with no lifting greater than ten pounds.
26. On May 20, 2008, Dr. Mark Phillips performed a cervical epidural steroid injection.
27. On May 21, 2008, plaintiff was evaluated by Dr. Vincent E. Paul, orthopedic surgeon, on referral from her attorney. Dr. Paul does not perform back or spine surgery and has not performed any such surgery for at least five years. Dr. Paul does approximately four to five independent medical examinations or second opinion evaluations per week at the request of plaintiffs' attorneys, and approximately twenty to twenty-five percent of those attorney referrals come from The Deuterman Law Group, counsel for the plaintiff in this case.
28. Following an examination and review of plaintiff's radiological studies, Dr. Paul's assessment was preexisting cervical stenosis at C3-C4 and C4-C5 aggravated by on-the-job lifting activities, and he also noted that plaintiff's studies showed significant lumbar spinal stenosis at L4-L5. Dr. Paul noted that plaintiff's radiological studies of both the cervical and lumbar spine showed evidence of longstanding degenerative conditions that had developed over a period of many years, and he saw nothing that appeared to be acute in nature.
29. With regard to treatment, Dr. Paul recommended the usual sequencing for treatment protocols, which was epidural steroids and Lyrica, and then if no improvement, a surgical consultation with someone like Dr. Mark Yates or Dr. Michael Tooke. During his deposition Dr. Paul offered some risks and benefits to be considered by a surgeon when evaluating whether plaintiff might be a surgical candidate and what type of surgery might be more appropriate, but Dr. Paul was clear in his testimony that he was not recommending that *Page 12 
plaintiff undergo surgery and that he always refers patients who might be surgical candidates to other physicians who do spine surgery.
30. According to Dr. Paul, plaintiff was capable of light duty work at the time he saw her, specifically plaintiff was capable of performing sedentary clerical work in defendant's medical records department, although he might suggest some ergonomic modifications such as elevating her work surface so that she did not have to bend her neck to look down all day and could alternate between sitting and standing.
31. Despite the fact that Dr. Hilts' last work note indicated that plaintiff could return to work on May 26, 2008, plaintiff did not return to work at her medical records position for defendant. Liz Smith and Sandy Allender, the Director and Assistant Director of the Medical Records Department, testified that work was available and that they could have continued to provide sedentary work to plaintiff between April 2008 and the date of the hearing. They could also have made accommodations or ergonomic adjustments to plaintiff's work station to allow her to alternate positions and elevate the level of the records she was reviewing, as well as allowing her to work in a warmer area of the department.
32. On May 28, 2008, plaintiff returned to Hedgecock, reporting that the cervical epidural steroid injection did not result in any improvement in her symptoms. Ms. Hedgecock changed plaintiff's medication from Lyrica to Neurontin.
33. On June 3, 2008, plaintiff was evaluated by Dr. Mark Yates, a board certified orthopedic surgeon at Piedmont Orthopedics, on referral from Dr. Hilts in that practice. Dr. Yates regularly performs surgery on both the cervical and lumbar spine. Plaintiff reported to Dr. Yates that she had injured her neck at work, and he noted that MRI of the cervical spine showed cervical spondylosis, or arthritic changes in the neck caused by disc degeneration. Plaintiff was, *Page 13 
however, complaining more about back symptoms and neck symptoms, and she described pain with prolonged standing and classic claudication symptoms. Dr. Yates explained that neurogenic claudication is caused by severe lumbar spinal stenosis such as that evidenced on plaintiff's radiological studies, and it results in increased pain and weakness with standing and walking, relieved by sitting or leaning over a grocery cart. It was Dr. Yates' opinion, and the Full Commission hereby finds as fact, that plaintiff's low back and leg complaints on June 3, 2008 were caused by lumbar spinal stenosis at L4-5 and L5-S1.
34. Dr. Yates recommended a two level decompressive surgery from L4 to S1, with no fusion. He did not recommend any surgery on her cervical spine because when he saw her on June 3, 2008 she was having more lumbar symptoms than cervical symptoms.
35. Dr. Yates did not give any work notes to plaintiff. On June 17, 2008 he did complete a Guilford County Department of Social Services Disability Statement for plaintiff in which he indicated that if plaintiff had lumbar spine surgery, she would probably be incapacitated for two to three months postoperatively. While Dr. Yates did not discuss work activities with plaintiff on June 3, 2008, he felt that she was probably capable of performing sedentary clerical work in the Medical Records Department with no lifting greater than ten pounds.
36. Plaintiff returned to Guilford Pain Management on June 17, 2008 and was seen by physician's assistant Michael Love. She complained of aching in her neck and shoulders, but she said her lower back felt like it was "breaking." Mr. Love recommended changing her Neurontin dosage, and he prescribed Limbrel, a medical food product for the management of the metabolic processes of osteoarthritis. On June 27, 2008 plaintiff saw Hedgecock again, and Hedgecock increased her Limbrel dosage and recommended continuing with stretches. *Page 14 
37. On October 21, 2008 plaintiff was seen for an Independent Medical Examination by Dr. Max Cohen, a board certified orthopedic surgeon. Physical examination of plaintiff's cervical spine was normal, with the exception of muscular tenderness. Her reflexes were normal, as were strength and sensation in her upper extremities. Dr. Cohen's diagnosis was cervical spondylosis, which is an arthritic condition of the cervical spine that is usually treated conservatively. Dr. Cohen did not recommend surgery and did not decide whether surgery was in plaintiff's best interest when he saw her, but he did say that if any surgery were to be considered, it would probably need to be a two level decompression and fusion at C3-C4 and C4-C5. Dr. Cohen indicated that he would need to see plaintiff again for at least several more visits, and determine whether her symptoms correlated with those disc levels, in order to determine if she was a good candidate for surgery. Plaintiff would also need to have realistic expectations and understand fully what surgery could and could not do for her, as well as its benefits and risks. Based on his one examination of plaintiff on October 21, 2008, Dr. Cohen could not recommend that she undergo surgery. The fact that plaintiff reported no improvement following one cervical epidural steroid injection is a negative prognostic indicator with regard to potential surgery offering her any relief.
38. If plaintiff does not have surgery on her neck, then in Dr. Cohen's opinion she is very close to maximum medical improvement, although he would suggest a few more symptomatic treatments, such as a home traction unit, medications, and possibly some injections or selective nerve root blocks. Dr. Cohen projected a 5% permanent partial impairment rating to plaintiff's cervical spine.
39. With respect to plaintiff's lower back, Dr. Cohen's impression was multilevel lumbar spinal stenosis, which was severe at L4-L5. He suggested a trial of epidural steroid *Page 15 
injections, and then if her symptoms persisted or worsened, consideration of lumbar laminectomy from L3 to S1 with wide decompression of the the cal sac and attention to lateral recess stenosis, but with no fusion.
40. Dr. Cohen opined that it would probably be difficult, although not impossible, for plaintiff to perform her regular job at this junction in light of the condition of her neck and back. He agreed, however, that the light duty jobs plaintiff had performed, including recording messages for an answering service and reviewing medical records in the Medical Records Department, would be more suitable, particularly if ergonomic modifications could be made to allow her to alternate positions and look at records from a standing position, as well as finding a medication to control her symptoms. Dr. Cohen believes that plaintiff is capable of functioning in a sedentary or light work situation although ergonomically there may be issues to be addressed on an individual basis. Assuming that the clerical position in Medical Records did not involve lifting more than ten pounds, that plaintiff has the ability to change positions, and that ergonomic adjustments were made to her work station so that she did not have to keep her neck in a constant flexed position looking down, Dr. Cohen agreed that plaintiff is physically capable of performing that sedentary office type of work.
41. Dr. Yates evaluated plaintiff again on January 9, 2009. Plaintiff complained of both neck and lower back pain, but her low back was bothering her more than her neck. Dr. Yates again recommended a two level lumbar decompressive surgery from L4 to S1. He saw no indication based on his examination or her subjective symptoms to indicate that she had a herniated or ruptured disc that would require a discectomy. Assuming that Medicaid has approved payment for lumbar surgery, Dr. Yates would be willing to perform it. *Page 16 
42. With respect to plaintiff's cervical spine, Dr. Yates noted that her studies showed a shallow disc protrusion at C4-C5, a shallow protrusion at C5-C6 without significant stenosis, a left side paracentral protrusion at C6-C7, foraminal stenosis most severe at C3-C4 on the right, and that plaintiff was not having any right sided symptoms that would correspond with the C3-C4 stenosis. In Dr. Yates' opinion plaintiff's left sided symptoms are probably more related to the C6-C7 left disc protrusion. With respect to determining whether plaintiff might be a candidate for cervical spine surgery, Dr. Yates suggested ordering diagnostic foraminal injections under x-ray by a radiologist such as Dr. Mark Shogry to try to determine which level of the cervical spine is causing more symptoms. He would also want to analyze whether plaintiff's subjective symptoms correlated with her radiographic studies. The fact that plaintiff does not have any neurologic deficit on physical exam would indicate that she does not meet one of the indications for surgery.
43. According to Dr. Yates, plaintiff has not reached maximum medical improvement from the injury to her neck and shoulder/trapezius sustained at work on October 19, 2007, but he is still not certain if surgery on her neck would be beneficial to her.
44. After evaluating plaintiff again on January 9, 2009, Dr. Yates was still of the opinion that plaintiff is capable of doing sedentary clerical work in the medical records department with no lifting greater than ten pounds. He did suggest some possible ergonomic modifications to the job to help control her symptoms, such as changing her work station to reduce the amount of cervical flexion when reviewing records.
45. Plaintiff's low back and lower extremity symptoms began gradually in January 2008, consistent with her longstanding and progressive severe spinal stenosis. *Page 17 
46. When asked to assume that that plaintiff's low back symptoms came on gradually in January 2008, Doctors Menzer, Hunt, Hilts, Paul, Cohen, and Yates all testified that plaintiff did not sustain any injury to her lower back or lumbar spine on October 19, 2007, and that her current low back complaints were not caused or materially aggravated by her work activities or by her neck injury on that date. Based on the weight of the medical evidence, the Full Commission finds that plaintiff did not sustain any injury to her lower back or lumbar spine on October 19, 2007, and that her current low back complaints were not caused or materially aggravated by her work activities or by her neck injury on that date. Instead, plaintiffs' severe lumbar spinal stenosis that had been progressing over a number of years.
47. Defendant paid compensation to plaintiff for temporary total disability at the rate of $270.99 per week from October 22, 2007 to November 2, 2007, from November 22, 2007 to November 25, 2007 and from November 29, 2007 to January 8, 2008. The latter period of compensation was paid pursuant to a Form 62 dated December 28, 2007. On or about January 9, 2008 plaintiff returned to suitable sedentary work with the employer at the same or greater average weekly wage, and within the work restrictions recommended by Drs. Menzer, Hunt, and Hilts. On January 16, 2008, defendant prepared a Form 25T, Notice of Termination of Compensation by Reason of Trial Return to Work, reflecting plaintiff's return to work on January 9, 2008 at the same or greater wages. Defendant has not paid compensation to plaintiff since January 8, 2008, and plaintiff has never filed a Form 28U.
48. While plaintiff's evidence showed that Dr. Hilts authorized her to be out of work on February 11 and 12, February 15 to 28, April 3 and 4, and April 25 to May 25, 2008, plaintiff failed to sustain her burden of proving that her compensable injury to her cervical spine was the cause of those alleged periods of temporary total disability. The greater weight of the evidence *Page 18 
demonstrates that during this time period plaintiff was complaining to her treating physicians of increasing pain in her lower back and telling Threatt, defendant's workers' compensation specialist, that the reason she was unable to work was because of her ever increasing low back pain. When plaintiff called Dr. Hilts on February 15, 2008 requesting a note to be out of work, she was complaining of severe back pain. And while Dr. Hilts wrote the requested note for her, it is clear that he was evaluating and treating not only her compensable neck injury, but also her non-compensable low back complaints. When Dr. Hilts wrote a note for plaintiff to be out of work April 3 and April 4, he did so at the same time he was ordering a CT myelogram of the cervical and lumbar spines, and following the results of that study, Dr. Hilts made a referral on April 15, 2008 to Greensboro Imaging for lumbar epidural steroid injections for plaintiff's lumbar stenosis. Therefore, the Full Commission finds that to the extent plaintiff was temporarily totally disabled during the periods mentioned, the reason for such disability was her lumbar spine condition.
49. Plaintiff failed to sustain her burden of proving any disability after May 25, 2008, the last date any physician authorized her to be out of work for any reason. The last note given to plaintiff by Dr. Hilts was dated May 15, 2008, and it authorized her to be out of work only until May 26, 2008. Neither Dr. Hilts nor any other physician authorized plaintiff to be out of work, or opined that she was temporarily totally disabled, after that date. To the contrary, Drs. Hilts, Paul, Cohen, and Yates all testified that plaintiff is and has been capable of performing the sedentary clerical duties in the medical records department that she was performing successfully until approximately April 25, 2008 and that those duties were suitable to her physical capacity. This sedentary clerical job in defendant's medical records department is and has been available to plaintiff, and defendant indicated its willingness to make minor ergonomic and other *Page 19 
accommodations if necessary so that plaintiff may adjust her work station and the level of her work surface. This sedentary clerical job was suitable to plaintiff's capacity, but plaintiff has refused to return to this suitable available work and has made no efforts of any kind to find other suitable employment, despite the opinion of all physicians who have treated her that she is capable of working.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury to her neck or cervical spine on October 19, 2007. N.C. Gen. Stat. § 97-2(6).
2. Defendants have proven by the greater weight of the evidence that plaintiff did not sustain a compensable injury to her low back or lumbar spine on October 19, 2007, and plaintiff's low back and lumbar spine complaints and conditions, including her lumbar spinal stenosis, were not caused or materially aggravated by her work activities or by her cervical spine injury on October 19, 2007. N.C. Gen. Stat. § 97-2(6); Perez v. AmericanAirline AMR Corp., 174 N.C. App. 128, 620 S.E.2d 288 (2005),review improvidently allowed,360 N.C. 587, 634 S.E.2d 887 (2006), reh'g denied,360 N.C. 655, 638 S.E.2d 469 (2006); Parsons v. Pantry, Inc.,126 N.C. App. 540, 485 S.E.2d 867 (1997).
3. Plaintiff is not entitled to any compensation or medical compensation as a result of her nonwork related lumbar spine condition, and defendant is not responsible for the medical expenses incurred or to be incurred by plaintiff for treatment of her low back and lumbar spine conditions. *Page 20 
4. Plaintiff failed to sustain her burden of proving any disability as a result of her compensable cervical spine injury following her return to suitable employment on or about January 9, 2008, and therefore plaintiff is not entitled to any further compensation for disability at this time. N.C. Gen. Stat. §§ 97-29 97-30.
5. Alternatively, even if plaintiff had met her burden of proving disability, she is not entitled to any compensation because she unjustifiably refused suitable employment. N.C. Gen. Stat. § 97-32.
6. Subject to the limitation of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to additional medical compensation for treatment of the compensable injury to her cervical spine sustained on October 19, 2007. N.C. Gen. Stat. §§ 97-2(19) 97-25.
7. The Defendants are not liable for attorney fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 A W A R D
1. Plaintiff's claim for any benefits under the Act as a result of her low back and lumbar spine conditions, and any disability caused thereby, must be and is hereby DENIED.
2. Plaintiff's claim for additional temporary total disability compensation as a result of her compensable cervical spine injury on October 19, 2007 must be and is hereby DENIED.
3. Subject to the provisions of N.C. Gen. Stat. §§ 97-25 97-25.1, defendant shall pay for all authorized medical expenses incurred or to be incurred for reasonably necessary *Page 21 
medical treatment of plaintiff's compensable injury to her cervical spine on October 19, 2007 in accordance with Industrial Commission regulations.
4. Dr. Mark Yates is hereby designated as plaintiff's authorized treating physician.
5. Defendant shall pay the costs of this action, which includes expert witness fees of $400.00 to Dr. Frieda Menzer, $375.00 to Dr. Mary Ruth Hunt, and $450.00 to Suzann Hedgecock, P.A., if said fees have not been paid by prior order.
This the ___ day of October 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1